**In re Anonymous No. 73 D.B. 87**

Disciplinary Board Docket no. 73 D.B. 87.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

HEH, *Member,* October 12, 1988 — Pursuant to rule 208(d), Pa.R.D.E., the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above petition for discipline.

## HISTORY OF PROCEEDINGS

A petition for discipline was filed on October 5, 1987 alleging that respondent had commingled the funds of two estates with his personal funds, that he failed to withdraw and promptly turn over property regarding the [A] estate, and that he neglected the [B] estate and failed to account properly with respect to that estate.

Petitioner alleged that the conduct of respondent was in violation of the following disciplinary rules:

(A) D.R. 2-110(A)(2), requiring that an attorney shall not withdraw from employment without taking reasonable steps to avoid foreseeable prejudice to the rights of his client, including delivering to the client all papers and property to which the client is entitled;

(B) D.R. 6-101(A)(3), prohibiting an attorney from neglecting a legal matter entrusted to him;

(C) D.R. 7-101(A)(1), prohibiting an attorney from intentionally failing to seek the lawful objectives of his client;

(D) D.R. 7-101(A)(3), prohibiting an attorney

from intentionally prejudicing or damaging his client during the course of the professional relationship;

(E) D.R. 9-102(A), requiring that all funds of clients, other than advances for costs and expenses, be deposited in one or more identifiable bank accounts and that no funds belonging to the attorney or law firm shall be deposited therein;

(F) D.R. 9-102(B)(4), requiring that an attorney promptly pay or deliver to the client as requested by the client funds or other property in the possession of the attorney which the client is entitled to receive.

On November 5, 1987 the matter was referred to Hearing Committee [ ] consisting of [ ]. A hearing was held before this hearing committee on January 22, 1988. At that time the parties submitted a stipulation of facts accompanied by exhibits.

Petitioner submitted a letter brief dated March 4, 1988 and respondent countered with a letter brief dated April 8, 1988. Petitioner responded to oral arguments of respondent's counsel by presenting arguments that respondent violated each disciplinary rule as alleged in the petition for discipline. Petitioner argued that there were no mitigating circumstances in this case and that public censure would be appropriate discipline for the commingling indcident alone.

In the letter brief, respondent questioned whether the petitioner had presented evidence sufficient enough to show violations of D.R. 2-110(A)(2), D.R. 7-101(A)(1), D.R. 7-101(A)(3) and D.R. 9-102(B)(4). With regard to D.R. 2-110(A)(2), respondent argued that there was no proof that respondent withdrew his representation in the [A] matter. Respondent argued further that the record does not show that respondent intended to fail to seek the

legal objectives of his clients or intended to prejudice or damage his client. Finally, respondent argued that there was no request to turn over the funds involved in the [B] estate until Judge [C] directed that the funds be turned over to another attorney. Respondent argues that he acted in compliance with the directive of Judge [C].

Respondent also presented arguments in mitigation, concluding that a private reprimand would adequately serve the public interest. Respondent argued that he cooperated with disciplinary counsel, that he was dealing with difficult clients, that his clients lost nothing in the end, and that this was an isolated incident. The favorable character witnesses were also cited in support of respondent's position.

On June 28, 1988 the report of Hearing Committee [ ] was filed. The hearing committee found that respondent had violated D.R. 6-101(A)(3) and D.R. 9-102(A), noting that respondent admitted that his conduct was in violation of these rules. The hearing committee went on to find that respondent had violated D.R. 7-101(A)(1) and D.R. 7-101(A)(3) (intentionally failing to seek the lawful objectives of the client and intentionally prejudicing or damaging the client). The hearing committee found no violation of D.R. 2-110(A)(2) and D.R. 9-102(B)(4), stating that the evidence shows that respondent was never technically requested to withdraw. He was, therefore, not subject to the requirements of D.R. 2-110(A)(2). The hearing committee found that respondent delivered papers and property when requested to do so. The hearing committee recommended that public censure of respondent would be the proper disposition of this matter.

The Disciplinary Board adjudicated this matter at the September 9, 1988 meeting of the board.

## FINDINGS OF FACT

The findings of fact are taken almost exclusively from the stipulation entered into by the parties involved in this matter. Changes have been made to include additional facts.

(1) Respondent, [ ], was born in 1922 and was admitted to practice law in the Commonwealth of Pennsylvania in 1950. His office for the practice of law is [ ]. His attorney registration number is [ ].

### *Background — Prior Informal Admonition*

### *(Complaint File nos. [ ] and [ ])*

(2) On February 9, 1984, [A] died intestate. Respondent filed a petition for letters of administration on behalf of [D] (of [ ]) and [B], the decedent's sister and brother, and they were appointed co-administrators of the [A] estate on February 21, 1984.

(3) [B] died testate on April 7, 1984. Respondent filed a petition for letters testamentary on behalf of [E] (of [ ]) and [F] (of [ ]), sisters of the decedent, and they were appointed co-executrices of the [B] estate on April 13, 1984. Under the terms of [B's] will, [E] was the sole heir and beneficiary.

(4) [A] and [B] jointly owned a farm in [ ] County, Pa., as tenants-in-common and this realty was the primary asset in each of these estates. Both the realty and the personal property of both estates were sold at a public auction sale held on August 25, 1984.

(5) The net proceeds from the sale of the personal property in the amount of $8,106.02 was deposited by respondent into account no. [ ] in the name of "[G] and [Respondent] ITF [A] and [B]" at the [H] National Bank on or about August 27, 1984. There was a dispute among the three clients of respondent as to how the proceeds of the personal property

should be apportioned between the two estates. [E] claimed that a majority of the personal property belonged solely to [B] and, therefore, should be apportioned to the [B] estate, while [D] and [F] wanted to split the personal-property proceeds fifty-fifty between the two estates.

(6) Because [F] did not approve of the adequacy of the sale price which had been bid on the realty, respondent petitioned for and obtained court approval on behalf of his other two clients ([D] and [E]) to conclude the sale of the realty for the bid price of $104,000 despite [F's] objections that the realty was worth significantly more. Closing on the sale of the realty occurred on November 19, 1984 and respondent deposited the net proceeds of the sale in the amount of $89,719.04 into the above-referenced account (hereafter "[H] Account").

(7) Because of the disputes between the two estates and respondent's three individual clients over the various assets of the two estates and respondent's failure to resolve those disputes or proceed with the proper administration of the estates, both [D] and [F] filed separate disciplinary complaints against respondent which were docketed to no. [   ] and [   ], respectively.

(8) After investigation, analysis and review pursuant to the provisions of rule 208, Pa.R.D.E., an informal admonition was administered to respondent by disciplinary counsel on January 13, 1986 for conduct which was found to have been in violation of D.R. 5-105(B), requiring an attorney to withdraw from multiple representation involving conflicting interests, and D.R. 6-101(A)(3), prohibiting neglect of a legal matter. The informal admonition became final on February 12, 1986 and both [D] and [F] were notified of the disposition of their separate complaints.

(9) However, both [D] and [F] thereafter complained to disciplinary counsel and alleged that respondent was continuing to ignore his duties and responsibilities with regard to both estates. A new complaint file was opened ([   ]) which led to the following facts.

(10) Respondent represented the personal representatives of both the [A] and [B] estates and maintained a savings account no. [   ] at the [H] National Bank ([H] Account) which was used exclusively as a common depository for funds of both estates.

(11) By check dated May 5, 1985, respondent transferred the sum of $42,000 from the [H] account to account no. [   ] at the First National Bank of [I] in the name of "[J] and [Respondent]." This was a personal joint money market account that respondent owned with his wife and wherein he maintained their personal funds. This money market account (hereafter "[I] Account") earned interest at variable interest rates which changed sometimes as often as two or three times a month.

(12) Respondent, by stipulation of facts, admitted that the transfer of this $42,000 was without the knowledge or consent of any of his three clients.

(13) The principal amount of $42,000 remained commingled in respondent's personal account until he re-transferred the sum of $42,000 back to the [H] account on March 19, 1986, after he had received the informal admonition from the Office of Disciplinary Counsel.

(14) At no time during the disciplinary proceedings that culminated with the informal admonition did respondent make known the transfer of the $42,000.

(15) On June 17, 1986, [K] of the Office of Disciplinary Counsel personally interviewed respondent about his handling of the estates' funds and

suggested that respondent calculate the interest the $42,000 had earned while it had been commingled in respondent's [I] account and to transfer that sum to the [H] account. This advice was confirmed by letter dated June 18, 1986.

(16) On June 30, 1986, after receiving the advice of [K], respondent transferred the sum of $2,240 from his [I] account to the [H] account. Respondent has never explained to any of his clients how he calculated the interest figure of $2,240.

(17) When testifying at the hearing held January 22, 1988, respondent frankly admitted that he had full knowledge based on his years as an active legal practitioner that a transfer of estate funds to his personal account was wrong.

(18) While respondent had commingled the estates' funds with his own, he did not misappropriate or convert to his own use any of the estates' funds.

## [A] Estate — Failure to Withdraw and Promptly Turn Over Property

(19) Being dissatisfied with the manner in which respondent had represented her as administrator of the [A] estate, [D] retained attorney [L] to replace respondent as her counsel and to conclude the administration of the [A] estate.

(20) By letter dated August 15, 1985, [L] advised respondent that he had been retained by [D] and suggested a meeting to effect the transfer of the files for the [A] estate and, by implication, the assets of that estate. Respondent failed to reply to this letter.

(21) Having received no response from respondent, Attorney [L] wrote additional letters to respondent dated September 24, 1985 and October 22, 1985 requesting respondent to turn over the files

with regard to the [A] estate. Respondent failed to reply to either of those letters.

(22) By letter dated November 14, 1985, Attorney [L] sent respondent a copy of a petition for rule to show cause why respondent should not turn over the files and assets of the [A] estate and advised respondent that Attorney [L] intended to present the original of that petition to [   ] County President Judge [C] on December 5, 1985.

(23) Having received no response whatsoever from respondent, on December 5, 1985 Attorney [L] appeared before Judge [C] and presented his petition. Instead of acting formally on the petition, Judge [C] called respondent and had him come to the courthouse and directed that respondent turn over everything he had relative to the [A] estate to Attorney [L]. After this meeting with Judge [C], respondent returned to his law office with Attorney [L] where respondent turned over the [A] estate file and gave [L] a check in the amount of $50,000 drawn on the [H] account. Respondent promised to compute the amount of money still due to the [A] estate and to mail Attorney [L] a check the following day. However, respondent did not do so.

(24) By letter dated December 26, 1985, Attorney [L] demanded that respondent remit the remaining funds due to the estate, plus interest. By letter dated December 31, 1985 respondent transmitted an additional $4,110 to Attorney [L] and contended that there was a dispute between the two estates as to entitlement of the $8,106 proceeds of the sale of the personal property.

(25) By letter dated April 16, 1986, respondent transmitted to Attorney [L] a check in the sum of $4,772.94 and contended that it was the interest earned in the estate of [A] and was the final sum due to the [A] estate. Respondent did not explain

how he compiled the figure of $4,772.94. [L] later treated that figure as the interest earned on the [A] estate funds while those funds were in respondent's possession.

(26) Thereafter, Attorney [L] proceeded to prepare and file an inheritance tax return and paid tax in the principal amount of $6,463.93 and an interest-penalty charge in the sum of $1,110.46; additionally, Attorney [L] prepared and filed a first and final account with the Orphan's Court which was duly audited and adjudicated concluding the administration of the [A] estate.

## [B] Estate — Continued Neglect and Failure to Account

(27) One of the conflicts which remained an issue even after respondent had been replaced as counsel for the [A] estate was [E's] claim that more than half of the personal property belonged solely to [B] and, therefore, should be apportioned to [B's] estate rather than the fifty-fifty split desired by [D] and [F]. In November 1985, [E] personally met with respondent and discussed what respondent was going to do to settle this dispute. Respondent had [F] execute an affidavit setting forth the various items of personalty which she claimed belonged solely to [B] and advised [F] that he would present the question to the court for resolution. However, respondent never did pursue this issue despite repeated inquiries from [F] over the course of the next year and a half.

(28) By letters dated January 15, 1986, March 25, 1986, April 5, 1986, and May 29, 1986, [E] asked respondent to provide her with information and documentation relative to the [B] estate. Among various other things, [E] was interested in knowing what respondent was doing relative to the conflict

over the personal property, why Attorney [L] was handling the [A] estate, and why things were taking so long to conclude. She also repeatedly asked respondent for copies of a bank statement for an additional account he had advised her he had opened when they had met back on November 5, 1985. Respondent did not respond to any of these letters.

(29) [F], having learned on her own that monies were missing from the [H] account, wrote to respondent by letter dated February 27, 1986 and, among other things, specifically asked that respondent provide her with copies of all monthly statements for that account and asked respondent to schedule a joint meeting with her sister so that the administration of the estate could be concluded. Respondent failed to reply to this letter.

(30) By letters dated March 17, 1986, April 11, 1986, and April 22, 1986, disciplinary counsel wrote to respondent requesting certain information and documentation. Respondent did not reply to these letters.

(31) By letter dated July 11, 1986, respondent sent [F] and [E] copies of a Pennsylvania Inheritance Tax Return he had prepared for their execution as executrices of the [B] estate and invited them to make any suggestions or corrections they may have had. Similarly, by letter dated July 16, 1986, respondent forwarded copies of a first and final account which he had prepared and invited [F] and [E] to make any suggestions or corrections they may have had.

(32) By letter dated July 21, 1986, [F] wrote to respondent asking many questions and providing him with her suggestions and corrections to the inheritance tax return and the first and final accounting. With regard to both the tax return and the final accounting, [F] noted that respondent had

failed to list or account for [B's] $5,014.57 residuary share and $4,300 reimbursable expenses due from the [A] estate. Additionally, since the accounting listed the sum of $2,240 in interest earned at the [I] Bank, of which she had no previous knowledge, [F] asked respondent to fully explain all of the facts and circumstances regarding that account. She also questioned respondent's "income" figures and indicated that her questions were the result of respondent's failure to provide her with the monthly statements. She also noted that the proposed accounting failed to indicate anything with regard to interest-penalties which would be due because of the late payment of the inheritance tax. Finally, she indicated she could not sign any tax return until respondent answered all of her questions and requests.

(33) By letter dated July 23, 1986, (with a subsequent note dated July 28, 1986), [E] wrote to respondent also questioning various aspects of the return and accounting he had prepared and asked respondent to provide explanations.

(34) By letter dated July 25, 1986, respondent sent [E] a "packet of papers" which he had received from [F] and asked for [E's] comments.

(35) By letter dated September 2, 1986, [E] acknowledged receipt of the "packet of papers" but indicated to respondent that she would not comment on them until respondent answered her communications of July 23 and 28, 1986. She also enclosed a delinquency notice noted August 27, 1986 which she had received from the Pennsylvania Department of Revenue and directed respondent to handle that matter.

(36) Without responding directly to their previous letters, respondent did redraft the inheritance tax return and first and final accounting and sent copies to [F] and [E] by letter dated September 11, 1986.

(37) By letter dated September 16, 1986, [F] wrote to respondent and provided him with her own "corrected" version of the tax return and authorized respondent to immediately pay the principal tax due as indicated in the amount of $8,483.78. She also advised respondent that his revised final accounting left many unanswered questions and that until respondent provided explanations she could not complete her review of that document.

(38) By letter dated September 18, 1986, [E] wrote to respondent also enclosing a "corrected" copy of the tax return and authorizing and directing respondent to immediately pay the sum of $8,483.78. She also asked respondent to indicate who was responsible for paying the interest-penalty which had yet to be calculated but which was due because of the late filing and payment of the inheritance tax. She indicated that she had asked respondent this question many times in the past but had never received a direct answer from him. As to the accounting, [E] indicated she still had many questions and demanded that respondent send her copies of all bank statements for all accounts.

(39) By letter dated September 22, 1986, respondent sent [F] and [E] copies of the inheritance tax return for their execution. His letter further indicated that a revised final accounting would be recomputed and forwarded "shortly."

(40) By separate letters dated September 25, 1986, both [E] and [F] returned their own executed originals of the tax return to respondent with instructions that the return be filed immediately and the tax paid.

(41) On or about September 30, 1986, respondent filed the inheritance tax return with the Register of Wills and paid the sum of $8,483.78. He did not pay any interest-penalty at that time.

(42) By letter dated October 29, 1986, [E] wrote to respondent again requesting respondent to provide her with copies of all bank statements and a complete breakdown of all interest and transactions with regard to the funds of the estate, as well as other information.

(43) By letter dated November 11, 1986, respondent provided [E] with copies of some of the bank statments from the [H] account but did not send any from the [I] account. He also provided [E] with a revised final accounting for her corrections and approval. At or about that same time, respondent provided [F] with his revised accounting but failed to provide her with copies of any of the bank statements which she had repeatedly requested.

(44) By letter dated December 4, 1986, [E] wrote to respondent about her many questions and concerns. She noted that some of the bank statements on the [H] account were missing and others were blurred and asked respondent to provide more legible copies. She specifically requested respondent to send her copies of the statements from the [I] account, which respondent had still not provided. She authorized respondent to pay the interest-penalty on the inheritance tax on the condition that it would be deducted from respondent's legal fee, since it was his fault the tax had not been timely paid.

(45) By letter also dated December 4, 1986, [F] wrote to respondent raising her own questions and concerns. She noted that it was impossible for her to correct respondent's proposed accounting without copies of all monthly statements for the [H] account as well as the [I] account, which respondent had failed to send her despite her numerous requests. She indicated that [F] had sent her copies of what

respondent had provided to her but that even those were incomplete. Among other questions, she asked respondent to explain:

(A) Why $42,000 had been withdrawn from the [H] account on May 5, 1985 and redeposited on March 20, 1986, which she assumed had gone into and come out of the [I] account and again asked respondent to provide monthly statements.

(B) How respondent computed the interest figure of $2,240 which he deposited to the [H] account on June 30, 1986 and why it took him from March 20, 1986 to June 30, 1986 to determine the interest earned.

(C) How respondent computed the interest figure of $4,772.94, which amount respondent had sent to Attorney [L] on April 17, 1986.

Respondent did not reply.

(46) On December 23, 1986, respondent withdrew the sum of $1,765.46 from the [H] account, obtained a money order from the bank in that amount, and paid the register of wills for the interest-penalty due as a result of the delinquent payment of the inheritance tax.

(47) By letter dated December 24, 1986, respondent provided both [F] and [E] with copies of "recent payment, the bank money order and the print-out from the Register of Wills Office with regard to the Inheritance Tax of the estate of [B]." Respondent's letter did not indicate that the $1,765.46 came from the [H] account or whether or not he was willing to have that amount deducted from his legal fees.

(48) By separate letters dated January 19, 1987 and January 20, 1987, [F] and [E], respectively, advised respondent that they were still awaiting his replies to their letters dated December 4, 1986 and that they could not proceed to review and correct his

proposed final accounting until he provided all of the information and documentation they had requested. Additionally, [F] asked respondent the source of the $1,765.46 used to pay the interest-penalty on the inheritance tax.

(49) By separate letters dated January 27, 1987, respondent wrote to [F] and [E] and replied to some of their questions and concerns.

(A) He provided blurred copies of the missing bank statements on the [H] account and explained that those were the best the bank could provide.

(B) He provided copies of the monthly statements for the [I] account dated May 31, 1985 through March 31, 1986 — almost a year after both of his clients began asking for "all" of the bank statements.

(C) He did not explain, however, how he had calculated the interest figures of $4,772.94 or $2,240.

(50) By letter dated February 10, 1987, [E] wrote to respondent againt raising many questions and concerns. She again asked to be provided with better copies of the blurred bank statements and noted that respondent had failed to explain how he had computed the interest figures of $4,772.94 and $2,240. As to the $1,765.46 interest-penalty payment, she asked respondent why he had not listed that obligation in the accounting and again asked if he intended to deduct that amount from his legal fee. She asked for a "full explanation of interest, month by month" that the estates' $42,000 earned while it was in respondent's personal account and why respondent had put the funds into that account without any authority of the executrices.

(51) By letter dated February 20, 1987, respondent replied to [E's] letter of February 10, 1987. However, his letter was inadequate. For example, again he did not explain how he calculated the interest figures. With regard to the interest-penalty

on the inheritance tax, he stated that the interest charged by the commonwealth approximately equaled the interest earned by the estate so the estate suffered no loss. He represented that the $42,000 was "segregated" in the [I] account when, in fact, this was a joint account with his wife wherein he also maintained his own funds. Finally, even though he had not fully responded to all of [E's] questions and concerns, he suggested that the estate could be settled by "mutual release" and that this could be accomplished "in a matter of days." Respondent sent [F] a copy of this letter.

(52) By letter dated March 2, 1987, [F] wrote to respondent noting that respondent continued to be "evasive" and that there were still "unanswered questions before the final accounting can be approved." She also noted that she was able to obtain "better" copies of the monthly statements from the [H] National Bank and had been told that respondent had been provided with "good" copies. Among other things, [F's] letter:

(A) Questioned a number of withdrawals including a withdrawal on February 6, 1985 in the amount of $234 for an administrator's bond and asked why it was necessary to purchase such a bond since [B's] will directed that the executrices not be required to post bond;

(B) Asked by what authority and why respondent transferred the $42,000 into his joint account with his wife and questioned respondent's claim that this $42,000 had been "segregated";

(C) Questioned the sufficiency of the $2,240 in interest respondent claimed the $42,000 had earned while in the [I] account and again asked respondent how he had calculated that figure;

(D) Again asked respondent to explain how he calculated the $4,772.94 interest figure; and

(E) Stated that respondent's "justification" for paying the $1,765.46 interest-penalty from the estate's funds was "simply not acceptable" and noted that it was respondent's neglect which caused [B's] estate to incur the $1,765.46 interest-penalty and [A's] estate to incur an interest-penalty in the amount of $1,010.46.

(53) By letter dated March 10, 1987, respondent wrote to [F] (with a copy to [E]) and replied to her letter of March 2, 1987. In this letter, respondent indicated that a number of the questioned transactions, including two administator's bonds for $234 were relative to [A's] estate, not [B's] estate, that he was willing to abide by [F's] interest figures, and that he would "make up the difference" with regard to the inheritance tax interest-penalty. Despite the above, he proposed a simple schedule of distribution which included fees to him in the full amount of $3,400.47.

(54) By separate letters dated April 13, 1987 and April 14, 1987, [E] and [F], respectively, provided respondent with their own proposed "corrected" first and final accounting consisting of 16 pages which they had mutually drafted. They requested respondent to put this in final form and return it to them for review and execution. Among other things, [E's] and [F's] proposed accounting provided that:

(A) Respondent receive only $1,286.24 as his fee ($3,400.47 less $1,765.46 interest-penalty and less $328.77 underestimated interest from [I] account);

(B) $500 "Reserve for Administration"; and,

(C) That the [A] estate should be "billed" for $712.98.

[F] again also raised a question as to the income tax liability of the estate on the interest earned by the estate during the years 1984, 1985 and 1986.

(55) By letter dated May 1, 1987, respondent

wrote to both [E] and [F] and enclosed the original and two copies of the first and final account and asked that they sign and return the original and one copy and stated that upon receipt the estate could be closed and the monies disbursed. Respondent also enclosed "releases" by which [F] and [E] released each other from further liability or obligation as executrices of the estate. The accounting provided was exactly as had been provided by [F] and [E], except that respondent had retyped the cover page and pages 6 and 8.

(56) By letter dated May 7, 1987, [F] wrote to respondent noting that respondent's letter failed to indicate if he was agreeing to accept only $1,286.24 as his fee, what he intended to do about billing the [A] estate for $712.98, and what he intended to do with the $500 "Reserve for Administration." She also noted respondent had failed to answer her questions as to any income taxes due or paid on the interest the estate had earned in 1984, 1985, 1986 and asked, if any taxes had been paid, for respondent to provide her with copies of receipts. She indicated she was not prepared to sign a release until respondent provided answers and the documentation needed.

(57) Being frustrated and confused by respondent's communications, [E] consulted with Attorney [M] of [   ], who wrote to respondent by letter dated May 8, 1987 which indicated that [E] was willing to sign a release if she would get two checks in the amount of $57,146.18 and $1,700.23, if [F] would get $1,700.23, and if respondent agreed to get only $1,286.24.

(58) By letter dated May 12, 1987, respondent advised Attorney [M]: "In reference to your letter of May 8, 1987, the distribution as indicated of the funds we are holding in trust would be exactly as

stated in your letter." Respondent enclosed a copy of the May 1, 1987 [H] account statement. Respondent's letter was confusing in that he could not possibly make "distribution . . . exactly as stated" in [M's] letter since respondent was not holding sufficient funds in the [H] account to do so.

(59) By letter dated May 14, 1987, respondent wrote to [F] in response to her letter of May 7, 1987. Respondent stated, inter alia: "With respect to the interest of 1984, 1985, 1986, I have taken care of paying these." Additionally, respondent stated: "the accounting set forth in your letter is acceptable to me. However, it will not be filed until the release which I have sent you has been signed and returned." Respondent's letter did not say how he had "taken care of paying" the income taxes on the interest earned by the estate during 1984, 1985 and 1986 nor did he provide copies of payment receipts as [F] had previously requested. Additionally, respondent failed to answer [F's] questions as to what was going to happen to the $500 "Reserve for Administration."

(60) Respondent never prepared or filed any fiduciary income tax returns for the estate even though the estate earned considerably more than $600 in interest in each of the years in question.

(61) By letter dated May 19, 1987, Attorney [M] wrote to respondent asking how he could make distribution "exactly as stated" in [M's] previous letter when respondent did not have sufficient funds to do so.

(62) By letter dated June 15, 1987, respondent wrote to [M] and explained that he never had possession of certain items but that "Monies are available to be distributed in accordance with the accounting prepared by me and revised by [E] and

[F] and I am willing to make distribution in accordance with the accounting."

(63) By joint letter dated July 15, 1987, [E] and [F] directed respondent to deposit all of the estate funds he was holding in the [H] account into an account that the executrices had at the [N] Savings Association in the name of the estate within 10 days and indicated that once all of the funds of the estate were in the "official" account of the estate of [B], they would make distribution to pay all outstanding bills.

(64) On August 7, 1987 respondent closed out the [H] account and deposited the sum of $52,861.21 to the [N] Savings Association account and notified both [F] and [E] of these facts by letter of the same date.

(65) Thereafter, [E] and [F] made distribution of the estate assets, including sending a check in the amount of $1,286.24 to respondent by letter dated September 5, 1987 for his legal fees as counsel for the estate.

(66) While no formal accounting has been filed nor releases executed, as far as the executrices appear to be concerned, respondent's duties and responsibilities as attorney for the estate of [B] were finally concluded as of the end of August 1987 — more than three years after they had begun.

(67) Despite the informal admonition that was administered to respondent by the Office of Disciplinary Counsel on January 13, 1986 for violation of D.R. 5-105(b) and D.R. 6-101(A)(3), respondent continued to ignore his duties in rendering legal services.

(68) Respondent intentionally failed in his duty to seek the lawful objectives of his client in administering within a reasonable period of time the respective estates of [A] and [B]. He repeatedly ignored requests for information from the fiduciaries he

represented, refused to prepare and file appropriate tax returns, and refused to explain his grossly inadequate services to said fiduciaries.

## DISCUSSION

Respondent does not deny that he commingled funds of the [A] estate with his personal funds, admitting that he violated D.R. 9-102(A). Additionally, respondent has admitted that he neglected the [A] estate matter, characterizing his own conduct relating to that matter as "gross." By admitting his neglect respondent has acknowledged that he has violated D.R. 6-101(A)(3).

The events that transpired following the transfer of estate funds to the personal account give rise to the appearance that respondent was neglecting the [A] estate to avoid disclosing to the executrices and others that he had commingled the estate funds. This appearance suggested by disciplinary counsel and a hearing committee member, was denied, however, by respondent.

Even though respondent denies that he intentionally avoided inquiries of his clients and intentionally failed to complete the administration of the [A] estate, it is nevertheless apparent that respondent did intentionally fail to seek the objectives of his clients and that his intentional acts were detrimental to those clients. It is highly unlikely that respondent set out upon his course of action with the goal of harming the interests of his client but the end result of his decisions was that the objectives of his clients were not met and their interests were damaged.

Respondent admitted that he made a conscious decision not to respond to certain inquiries of his clients. He admitted that he made a conscious

decision to avoid the sticky issue of the division of the proceeds from the sale of the personal property owned by the [A] brothers. During the three years that the estate administration dragged on, interest accrued on the unpaid inheritance tax. Even to this day the administration of the estate has not been completed with the filing of the final acount nor have tax returns been filed for the income generated by the estate funds durig 1984, 1985 and 1986. These facts indicate that respondent has violated D.R. 7-101(A)(1) and D.R. 7-101(A)(3). The failure to pursue the objectives of his clients and the damage to their interests were not the result of inadvertent acts by respondent, but instead resulted from the course of action that he chose.

In furtherance of the protection of the public interest, this matter calls for more than private discipline.

The mitigating circumstances advanced by respondent in the letter brief do not reduce the seriousness involved in commingling client funds with private funds to the level that only private discipline would be adequate. As argued by petitioner in the letter brief, commingling alone would be enough to require public discipline.

## RECOMMENDATION

For the foregoing reasons, the Disciplinary Board recommends that respondent, [    ], receive a public censure by the Supreme Court of Pennsylvania. It is further recommended that, pursuant to rule 208(g), Pa.R.D.E., respondent be directed to pay the necessary expenses incurred in the investigation and prosecution of this matter.

Mr. Eckell and Dr. Gilbert dissent.

Messrs. Douglas, Tumolo and Keller did not participate in the adjudication.

536

## DISSENTING REPORT

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

ECKELL, *Member,* October 12, 1988 — I respectfully disssent from the sanctions recommended by the majority of the Disciplinary Board. I recommend a suspension of three months.

Despite an informal admonition in 1986 for violating D.R. 5-105(B), requiring withdrawal in a conflict of interest situation; and D.R. 6-101(A)(3), prohibiting the neglect of a legal matter, respondent continued to ignore his duties in the very matter which gave rise to the informal admonition.

A majority of the Disciplinary Board concludes that respondent's continued neglect after being disciplined warrants a public censure. I conclude such conduct requires more emphatic discipline in the form of a three-month suspension. The majority report contains 68 findings of fact. Virtually all of those findings refer to some improper conduct of respondent. This is not to say that discipline should be quantitatively fixed by the number of paragraphs making findings of impropriety by respondent. However, it is difficult to read those findings and conclude that anything short of suspension meets the responsibilities of the disciplinary system to the public.

Respondent's continued improper conduct following discipline for that same conduct, clearly indicates his failure "to get the message." He continued to practice in a manner which further harmed the same individuals he previously neglected. Future potential clients need protection from this respondent.

Perhaps respondent's age (66 years) motivated the majority to recommend public censure. I, too, abhor

the idea of seriously disciplining a senior member of the bar; however, the integrity of our disciplinary system cannot be adjusted depending upon a respondent's age. Lawyers, more than any others, must be even-handed in disciplining themselves.

For the reasons set forth above, I dissent and recommend that respondent be suspended for a period of three months.

Dr. Gilbert joins in the dissent.

## ORDER

And now, October 11, 1989, upon consideration of the report and recommendations of the Disciplinary Board and the dissenting report dated October 12, 1988, it is hereby ordered that [respondent] be subjected to public censure by the Supreme Court at the session of court commencing December 11, 1989, in [ ]. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to rule 208(g), Pa.R.D.E.

Mr. Justice Larsen and Mr. Justice Papadakos dissent and would impose a three-month suspension.